1

2

3

4

5                    UNITED STATES DISTRICT COURT

6                    NORTHERN DISTRICT OF CALIFORNIA

7

8    WALTER JEFFERSON,                        No. C-12-0926 EMC

9              Plaintiff,

10        v.                                   **ORDER GRANTING DEFENDANTS'
                                               MOTION FOR SUMMARY JUDGMENT**
11   CITY OF FREMONT, *et al.*,                **(Docket Nos. 96, 110)**

12             Defendants.
     _____/
13

14

15

16

17        In this case, Mr. Jefferson has alleged discriminatory treatment and harassment relating to his

18   use of the Fremont Tennis Center ("FTC").  The operative complaint, the Third Amended

19   Complaint, Docket No. 67 ("TAC"), names the municipality of the City of Fremont, the FTC, and

20   individual Jeff Gonce, who was the Tennis Director of the FTC.  Mr. Gonce is named in his official

21   capacity.  The TAC alleges the following three causes of action:  (1) Violation of Title II of the Civil

22   Rights Act of 1964 ("Title II"); (2) Violation of 42 U.S.C. § 1981 ("Section 1981"); and (3)

23   Violation of 42 U.S.C. § 1983 ("Section 1983") based on Mr. Jefferson's right to contract under

24   Section 1981.  Pending before the Court is Defendants' Motion for Summary Judgment, Docket No.

25   96 ("Motion"), on the three claims in the TAC against the City of Fremont and Mr. Gonce.[1]

26

27   _____

28        [1] Defendants contend, and Plaintiff does not dispute, that the Fremont Tennis Center is a city
     department and not itself a legal entity.  Thus, the City of Fremont is moving on the FTC's behalf.

**United States District Court**
For the Northern District of California

1    Mr. Jefferson filed this action as a *pro se* litigant in 2012.  After filing his first amended

2    complaint, Mr. Jefferson retained counsel, who withdrew in June of 2014.  *See* Docket No. 92.  Prior

3    to counsel's withdrawal, counsel represented Mr. Jefferson in connection with filing the TAC and in

4    discovery.  Currently, however, Mr. Jefferson is no longer represented by counsel.

5        Having considered the parties' briefs, accompanying submissions, and oral argument, the

6    Court hereby **GRANTS** Defendants' motion for summary judgment.

7                              **I.    LEGAL STANDARD**

8        Summary judgment shall be rendered "if the pleadings, depositions, answers to

9    interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

10   genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

11   law." Fed. R. Civ. P. 56(c).  Where the plaintiff ultimately bears the burden of proof, the defendant

12   may prevail on a motion for summary judgment by pointing to the plaintiff's failure "to make a

13   showing sufficient to establish the existence of an element essential to [the plaintiff's] case."

14   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

15       To survive summary judgment, the nonmoving party "must do more than simply show that

16   there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith*

17   *Radio Corp.,* 475 U.S. 574, 586 (1986).  Instead the nonmoving party "must come forward with

18   specific facts showing that there is a genuine issue for trial."  *Id.*  An issue of fact is genuine only if

19   there is sufficient evidence for a reasonable jury to find for the nonmoving party.  *See Anderson v.*

20   *Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  Thus, the "mere existence of a scintilla of

21   evidence" is not enough."  *Id.* at 252.  For purposes of summary judgment, evidence must be viewed

22   in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in

23   the nonmovant's favor.  *See id.* at 255.

24                          **II.    FACTUAL BACKGROUND**

25       The facts below are viewed in Mr. Jefferson's favor.  The Court notes that despite receiving

26   a previous admonition by this Court regarding the need to observe Rule of Civil Procedure 56 in

27   opposing a motion for summary judgment, Mr. Jefferson did not file a substantive declaration or

28   attach any deposition testimony to support his opposition.  Instead, Mr. Jefferson filed four

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1  unauthenticated documents and a declaration asserting that "Mr. Gonce's declaration which provides

2  that the only problems between he and myself . . . consisted primarily of USTA incidents is untrue,"

3  and "[t]here are several other incidents of practices, procedures, and violation . . . that shall come to

4  light in the event of a court trial in the future." *See* Docket No. 105.  Mr. Jefferson does not specify

5  these "other incidents" any further.  Nor does Mr. Jefferson allege that any other witness's

6  declaration submitted by Defendants (*e.g.,* Kelly King, Sarah Robinson) is inaccurate or incomplete.

7  He later filed another unauthenticated document.  *See* Docket No. 111.  Because Mr. Jefferson is

8  acting *pro se* in opposing the motion for summary judgment, the Court affords him maximum

9  leniency permissible under the circumstances; it will consider the documents he has submitted (even

10  though not formally authenticated) and all deposition testimony in the record that might be

11  construed in his favor, even if the transcripts were submitted by Defendants rather than Mr.

12  Jefferson.  The Court also draws all reasonable inferences from the record evidence in his favor.  So

13  viewed, the record of undisputed facts or disputed facts and inferences drawn in Mr. Jefferson's

14  favor establishes the following.

15      Plaintiff Walter Jefferson is an African-American tennis player.  Beginning around 1985, Mr.

16  Jefferson began to utilize the FTC.  Docket No. 97, Ex. A ("Jefferson Tr.") at 116:17-117:1.  While

17  the precise dates are unclear, it appears that, from 1985 until approximately 2005, Mr. Jefferson

18  enjoyed the use of the FTC without incident.[2]  Mr. Jefferson participated in United States Tennis

19  Association ("USTA") amateur league team play, including as captain for certain USTA teams.

20  Jefferson Tr. 161:1-162:7.

21      The parties do not dispute certain aspects of Defendants' account of the facts.  *See* Opp. at 5

22  ("Plaintiff does not dispute Material Facts on pg 5, part 'A,' pg 6, and part of page 7.").  The parties

23  agree that the FTC is a "premier public recreational tennis facility and part of the City of Fremont's

24  _____

25      [2] In the TAC, Mr. Jefferson alleged that he "enjoyed the use of the FTC without incident"
    during the time period "from 1985 through 2009."  In opposition to Defendants' Motion, Mr.

26  Jefferson now alleges that discrimination started in 2000 when Mr. Gonce was promoted to
    supervisor and that, due to the discrimination, he ceased patronizing the FTC in 2005 until 2008.

27  *See* Opp. at 3-4; "Exhibit 'A'."  However, Mr. Jefferson points to no evidence of discrimination
    against him occurring prior to 2005.  Defendants dispute whether Mr. Jefferson in fact ceased to

28  patronize the FTC in 2005; Defendants point to print-outs from the USTA website that show that
    Mr. Jefferson continued to list the FTC as his "home court" from 2005-2008.  *See* Docket No. 108-4.

Parks and Recreation department." Motion at 5. Players utilize the FTC for a variety of types of play, including recreational play and lessons. The FTC also hosts USTA tournament matches and league play. *Id.* at 6.

The parties also agree that, beginning around 2008, the FTC experienced challenges stemming from the financial crisis, leading to "budget cuts, service reductions and a decrease in City personnel." Motion at 6; Docket No. 98 ("King Decl.") at ¶ 3. Fees paid by tennis players are the FTC's only source of funding. *Id.* Consequently, the FTC made an effort to maximize fees and accommodate demand for its courts, including implementing certain procedures for making a reservation. *Id.;* Docket No. 101 ("Gonce Decl.") ¶¶ 2-5.

Jeff Gonce began working at the FTC in 1998. Motion at 6; Gonce Decl. ¶ 1. In 2000, Mr. Gonce was promoted from Tennis Lesson Supervisor to "Tennis Operations Supervisor." *Id.; see also* King Decl. ¶ 4. Mr. Gonce remained in that position until his retirement in 2012. *Id.* The parties agree that Mr. Gonce's responsibilities included "managing the FTC, scheduling use of the FTC by all types of tennis players, supervising staff, and operating the FTC within its budget." Motion at 6; King Decl. ¶ 4. The parties further agree that Mr. Gonce was subordinate to Kelly King (whose title is Recreation Superintendent II), and that Mr. Gonce did not have the authority to enact official FTC policies or guidelines. *Id.*

A.    <u>Issues Concerning Reservation of Tennis Courts</u>

The record before the Court reflects a handful of conflicts over the years between Mr. Jefferson and Mr. Gonce[3]:

- In or around 2005 or 2006 Mr. Jefferson alleges that the lights turned off fifty minutes early during an evening recreational reservation. Jefferson Tr. at 122:2-20; 125:23-126:4; TAC ¶ 13. Mr. Jefferson suspected that Mr. Gonce, who was not present in the evenings, instructed others to set the FTC's timers to shut the lights off early. *Id.*

---

[3] Defendants argue that certain of these events took place outside of the statute of limitations period.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

- In April of 2009, Mr. Jefferson and his team were using the FTC's drying rollers to dry off a court after rainfall. Another FTC employee informed Mr. Jefferson's team that Mr. Gonce had instructed him to retrieve the rollers. *Id.* at 189:1-10. Mr. Gonce explained that, upon hearing the forecast of continued rain, he closed the FTC that day for safety reasons. Gonce Decl. ¶ 11. Mr. Jefferson does not present any facts to dispute that the FTC closed that day for safety reasons. *See* Opp.; *see also* Jefferson Tr. at 190:21-191:21 (testifying that no other teams showed up).

- Mr. Jefferson also alleges that Mr. Gonce ignored his emails. At his deposition, Mr. Jefferson focused on the period in December of 2010 during which Mr. Gonce was on medical leave. Jefferson Tr. at 138:18-139:8; 212:4-213:15; 218:4-220:20; Gonce Decl. ¶ 13 (discussing medical leave from November 22, 2010 to February 2011). After Mr. Jefferson contacted Mr. Gonce's supervisor (upon not obtaining a response from Mr. Gonce), Mr. Jefferson was given all of the reservation dates that he had requested. Jefferson Tr. at 213:11-14.

- Mr. Jefferson and Mr. Gonce clashed over reservations for USTA league play. The USTA organized socially-competitive amateur tennis league play, and the FTC participated in hosting league matches. *See* Gonce Decl. ¶¶ 3-4. Courts for USTA league play were obtained by making a reservation with the FTC.[4] For league matches, the USTA league team captains were required to email Mr. Gonce proposed dates for "home" matches; such requests were approved by Mr. Gonce subject to court availability and receipt of payment. Gonce Decl. ¶ 6; Ex. B. After approval, and at least 10 days before the proposed match, the team also had to fill out a use permit and pay fees of $10 per court, per match. *Id.* Courts were not "booked" on the reservation sheets until the FTC received the required fees. *Id.* At his deposition,

---

[4] While Mr. Gonce enforced the reservation rules with respect to USTA league play, it is undisputed that Mr. Gonce played no part in scheduling USTA tournament games. *Id.* at 116:7-14. At his deposition, Mr. Jefferson further testified that he could not remember an instance where Mr. Gonce interfered with Mr. Jefferson's ability to get on a court to play recreationally. *Id.* at 124:17-21.

United States District Court

For the Northern District of California

Mr. Jefferson described the reservation rules as "Jeff's policy" and stated "I don't think there was an actual City – City of Fremont policy." Jefferson Tr. at 135:5-11; *see also id.* at 243:1-6 (reservation rules were "set forth by Jeff Gonce, not by the City of Fremont."). In March of 2011, Mr. Gonce canceled certain requested dates reserved by Mr. Jefferson for USTA league play after discovering that Mr. Jefferson had booked the same dates at other facilities. Gonce Decl. ¶ 16.

- On Wednesday, June 22, 2011, Mr. Jefferson emailed Mr. Gonce stating that his team needed to finish a match "this Sat.," *i.e.,* three days after his email. Opp. at Ex. B. Mr. Gonce contends, and Mr. Jefferson does not dispute, that Mr. Jefferson had not previously requested the Saturday reservation.[5] Gonce Decl. ¶ 18. Therefore, Mr. Jefferson's request was late. *See* Gonce Decl. ¶ 6. Mr. Jefferson's email led to a confrontation between Mr. Gonce and Mr. Jefferson on June 23 or June 24. Opp. at Ex. C; Jefferson Tr. at 237:1-23. Mr. Jefferson came into the FTC the day after his email. Gonce Decl. ¶ 19. Mr. Jefferson requested the Saturday reservation to complete a match that he had started at Newark Memorial High School. *Id.* Mr. Gonce asked why Mr. Jefferson wished to finish a match at the FTC, when he had started the match in Newark. *Id.* Mr. Jefferson responded that the USTA required him to finish the match at the FTC. *Id.* This was not Mr. Gonce's understanding of the USTA rules. *Id.* Mr. Jefferson then telephoned Sarah Robinson, the Adult Leagues Coordinator for the USTA. *Id.*; Robinson Decl. ¶ 4. Ms. Robinson has

---

[5] Mr. Jefferson's present argument that this email was not sent three days before the requested match is contradicted by the record. In opposition, Mr. Jefferson argues that the attorneys for the City of Fremont perjured themselves by arguing that the email was three days before the requested reservation. Opp. at 5. Mr. Jefferson contends in his papers and argued at the hearing that he sent the email six days ahead of requesting a Tuesday, June 28 reservation. The email that Mr. Jefferson attaches, however, was clearly sent on Wednesday, June 22. The subject of the email is "Courts (Sat 6/28 @ 12:30PM)." It appears that the "6/28" in the subject is a typo, as the body of Mr. Jefferson's email references a need to finish a match "this Sat." Moreover, the email that Mr. Jefferson attaches from Ms. Mendoza states that the relevant reservation was "for Saturday." Saturday is three days after Wednesday. At his deposition, Mr. Jefferson offered sworn testimony regarding a letter he wrote regarding this incident, which states that the request was for courts that Saturday, June 25th. Jefferson Tr. 235:16-236:25. Thus, there is no dispute that the request was not timely. *See* Gonce Decl. ¶ 6 (requiring use permit had to be filled out 10 days in advance).

United States District Court

For the Northern District of California

submitted a non-party declaration in connection with the instant motion.[6]  Ms. Robinson explains that the USTA-NorCal rules require that a match be finished where it began -- in this case, at Newark Memorial High -- or at another facility within a designated geographical area.  Robinson Decl. ¶ 4.  Ms. Robinson did not tell Mr. Jefferson that the match was required to be completed at the FTC.  *Id.*  With respect to this incident, Mr. Jefferson does not offer evidence that disputes these facts.  Instead Mr. Jefferson has attached an email from someone named Melissa Mendoza.  In the email Mr. Jefferson offers as evidence, Ms. Mendoza corroborates Mr. Gonce's account of the confrontation, writing that "Walter kept replying that he could not play [anywhere] else because he was told by Sarah [Robinson] that he needed to play at the Fremont Tennis Center."  Opp. at Ex. C.  Ms. Mendoza goes on to say that "[a]fter Walter got off the phone [with Ms. Robinson,] he told Jeff, 'If you do not give me courts, I will go ahead and sue the city and I will get you fired, is this the route that you want to take Jeff[,] do you want to [lose] your job? Do you want to be fired?'"  *Id.*  Mr. Jefferson asserts that Mr. Gonce said to him at this time "You are not welcome here."  Jefferson Tr. 97:10-16.  Mr. Jefferson's supporting evidence consists of a note he wrote on Ms. Mendoza's email.  Mr. Jefferson's handwritten note, while not identifying any particular factual dispute with Ms. Mendoza's account, asserts "This is untrue!  She witnessed Jeff telling me I was unwelcome, to find elsewhere to play."  Opp. at Ex. C.

---

[6] In her declaration, Ms. Robinson describes two additional incidents involving Mr. Jefferson.  Ms. Robinson discusses a grievance that USTA-NorCal filed against Mr. Jefferson for violating USTA rules by attempting to change his player rating through registering under multiple aliases.  Robinson Decl. ¶ 2.  In the attached correspondence, in arguing against the grievance, Mr. Jefferson threatens the USTA with a civil lawsuit and alleges discrimination and harassment.  Robinson Decl., Ex. A.  Ms. Robinson also discusses an incident where she discovered that Mr. Jefferson had misrepresented whether he had permission to use courts at a particular location.  Robinson Decl. ¶ 3; Ex. B.  Although Ms. Robinson's facts are not disputed by Mr. Jefferson, other than Ms. Robinson's discussion of the June confrontation at the FTC, the facts she discusses do not appear relevant to the issue of whether the FTC subjected Mr. Jefferson to unlawful discrimination and harassment.

United States District Court

For the Northern District of California

B.      Residency Rules

In July of 2011, Mr. King directed Mr. Gonce to review the FTC's procedures governing the USTA league hosting program due to the increased demand for court space. King Decl. ¶ 23.[7]  Mr. Gonce contends that he consulted with "other public tennis facilities, team captains, and USTA staff" in determining how to limit the number of teams.  Mr. Gonce explored multiple proposals, including a cap, using "most popular team levels," and using Fremont residency criteria. *Id.* ¶ 26. The guidelines were ultimately reviewed and approved by Mr. King.  King Decl. ¶ 24.  The guidelines were never approved by the City Manager or City Council.  *Id.*  Other regional tennis facilities, such as Pleasanton Tennis Park and Mountain View Tennis, also use residency policies to allocate courts to USTA league teams.  Gonce Decl. ¶ 31.  The FTC's residency requirements do not bar a non-Fremont player from participating in league play, but rather assign priority to teams based on their number of Fremont residents.  *Id.* ¶ 27.  They also require that team captains be Fremont residents.  *Id.*

Mr. Jefferson disputes the motivation for the revision of the guidelines.  *See* Opp. at 8.  The sole evidence he cites is the deposition testimony from Jose Ramirez.  In deposition, Mr. Ramirez testified that in or around 2009, he became the sole captain of Mr. Jefferson's USTA tennis team after Jeff Gonce told Mr. Ramirez "that he wouldn't give [Mr. Ramirez] any courts if [Mr. Jefferson] was listed as co-captain because [Mr. Gonce] didn't want to deal with [Mr. Jefferson]."  Docket No. 97, Ex. I ("Ramirez Tr.") at 23:9-24:2.  Mr. Ramirez, however, explained in his deposition that he understood that the reason for Mr. Gonce's attitude was that Mr. Gonce and Mr. Jefferson "were two guys that didn't like each other."  *Id.*  Mr. Ramirez went on to testify specifically that he did *not* see Mr. Gonce engage in any conduct that Mr. Ramirez believed was racially discriminatory.  *Id.* at 27:15-28:4.  Mr. Ramirez stopped playing tennis for a period starting in 2010 and testified that he could not speak to anything that occurred at the FTC in 2011, which is when the FTC adopted the residency requirements.  *Id.* at 51:1-14; Gonce Decl. ¶ 29.

---

[7] These facts are undisputed.  *See* Opp. at 8 ("Pages 13, 14, & 15 of defendant's points and authorities are not in dispute by Plaintiff . . . ").

United States District Court
For the Northern District of California

1    Mr. Ramirez was one of twelve liability witnesses that Mr. Jefferson identified pursuant to

2    Rule 26 other than himself.  *See* Supp. Kohn Decl., Ex. A.  These witnesses appear to include other

3    players from Mr. Jefferson's USTA League team as well as former employees of the FTC.  Mr.

4    Jefferson, with the assistance of counsel, identified these witnesses as having "information regarding

5    harassment and discrimination and the Fremont Tennis Center."  *Id.*  Mr. Jefferson's Rule 26

6    witnesses were deposed.  *See* Kohn Decl. Exs. B-L.  Mr. Jefferson had the opportunity to develop a

7    favorable record from the testimony of these witnesses.  Mr. Jefferson's counsel appeared at these

8    depositions and elicited testimony on his behalf at most of the depositions.  *See, e.g.,* Kohn Decl.

9    Exs. C ("Blatnik Tr."); F ("Hrnjadovic Tr."); G ("Misra Tr."); Ramirez Tr.; J ("Singla Tr."); K

10   ("Concepcion Tr."); L ("Miller Tr.").  Yet, these witnesses failed to support Mr. Jefferson's claim of

11   racially motivated conduct by Mr. Gonce towards Mr. Jefferson.

12   While some of Mr. Jefferson's Rule 26 witnesses testified regarding conflict between Mr.

13   Gonce and Mr. Jefferson, none supported Mr. Jefferson's claim of racially-motivated harassment

14   and discrimination.  *See* Kohn Decl., Ex. C ("Le Tr.") at 27:4-28:15; Blatnik Tr. at 5:1-8; Ex. E

15   ("Brabham Tr.") at 23:4-24:6 (Gonce is "a very nice guy" and Brabham did not witness racial

16   discrimination or harassment); Hrnjadovic Tr. at 21:13-21 (no basis for testimony as to

17   discrimination); Misra Tr. at 26:5-13; Ex. H ("Pineda Tr.") at 27:24-28:8; Ramirez Tr. 27:15-28:4;

18   Singla Tr. at 33:18-34:11; Concepcion Tr. at 20:18-21:3; 23:22-24:9; 40:8-41:16.

19   Instead, the only witness to allude to race or ethnic discrimination was Lynn Rubin, a

20   spiritual advisor for Mr. Jefferson and a recreational tennis player at the FTC, whom Mr. Jefferson

21   did not list as a liability witness in Mr. Jefferson's Rule 26 disclosures.  *See* Supp. Kohn Decl., Ex.

22   A.  Mr. Rubin testified regarding Mr. Jefferson's claim for emotional distress.  In that testimony,

23   Mr. Rubin described his own recreational play at the FTC.  Supp. Kohn Decl., Ex. C ("Rubin Tr.")

24   at 57:24-61:1; 62:1-18; 16:22-17:1; 40:15-17.  Mr. Rubin had no experience with Mr. Gonce with

25   respect to USTA league play, as Mr. Rubin only played recreationally.  *Id.*  In his deposition, Mr.

26   Rubin described an encounter he had with Mr. Gonce over a recreational reservation.  At that time

27   Mr. Gonce allegedly said to Mr. Rubin "you people are always complaining."  *Id.* at 24:1-24.  Mr.

28   Rubin testified that he believed certain minority players experienced issues with Mr. Gonce with

United States District Court

For the Northern District of California

1    respect to booking recreational reservations at the FTC, including Mr. Jefferson.  *Id.* at 23:1-25.  Mr.

2    Rubin believed that Mr. Gonce made "concessions" to other groups, groups he identified as

3    "Filipino[s], Asians and whites."  *Id.* at 47:13-49:25.  Mr. Rubin could offer no other facts as a

4    percipient witness as to any other potential violation of Mr. Jefferson's civil rights.  *Id.* at 60:3-61:7.

5    Critically, Mr. Rubin testified that he was not able to offer an opinion or conclusion that Mr. Gonce

6    discriminated against others on the basis of race or other suspect classifications.  *Id.* at 51:13-54:4.

7    Moreover, Mr. Rubin's testimony (which otherwise might be helpful to Mr. Jefferson) is at odds

8    with Mr. Jefferson's testimony.  Mr. Jefferson testified that he could *not* recall having any issue

9    booking recreational play at the FTC.  Jefferson Tr. at 124:7-21.

10        In contrast to Mr. Jefferson's unsupported claim that Mr. Gonce engaged in racially-

11   motivated discrimination against him in recreation and USTA league use of the courts, Defendants

12   submit evidence supported with contemporaneous documents, establishing a history of Mr. Jefferson

13   allegedly not following the rules at the FTC, primarily regarding reserving courts and paying on

14   time.  *See* King Decl. ¶¶ 5-18; Exs. B-D.  For example, Mr. King discusses an incident in May of

15   2008 where Mr. Jefferson began play on the courts without paying.  King Decl. ¶ 12.  Mr. King

16   explains that at that time, when confronted, Mr. Jefferson "verbally abused the FTC's young part-

17   time staff member."  *Id.*  Contemporaneous documents also show that the FTC had concerns

18   regarding the impact of Mr. Jefferson's "chronic" failure to pay or cancel reservations in a timely

19   fashion.  *See* Gonce Decl., Exs. E, F.  These documents reflect a belief at the time that Mr.

20   Jefferson's infractions would affect general customer service and revenues.  *Id.*  Mr. Jefferson's

21   failure to follow the rules, Defendants contend, is the true cause of any conflict that he may have

22   experienced at the FTC.  In response, Mr. Jefferson has not presented any contrary evidence

23   showing that he did not violate the FTC's rules on the referenced occasions.

24                        **III.   ANALYSIS**

25        "Among other things, § 1981 guarantees all persons the right to make and enforce contracts,"

26   which right encompasses "the right to the enjoyment of all benefits, privileges, terms, and conditions

27   of the contractual relationship" *Johnson v. Riverside Healthcare Sys., LP,* 534 F.3d 1116, 1122 (9th

28   Cir. 2008) (citations omitted).  In turn, "Section 1983 provides a cause of action for the deprivation

1  of any rights, privileges, or immunities secured by the Constitution and laws by any person acting

2  under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory."

3  *Gomez v. Toledo,* 446 U.S. 635, 638 (1980) (citations omitted).  Mr. Jefferson brings his Section

4  1983 claim based on the alleged violation of Mr. Jefferson's Section 1981 rights.  TAC ¶ 27.

5          Under Title II "[a]ll persons shall be entitled to the full and equal enjoyment of the goods,

6  services, facilities, privileges, advantages, and accommodations of any place of public

7  accommodation . . . without discrimination or segregation on the ground of race, color, religion, or

8  national origin."  42 U.S.C. § 2000a.  Title II further provides that:

9          [n]o person shall (a) withhold, deny, or attempt to withhold or deny, or
           deprive or attempt to deprive, any person of any right or privilege secured by
10         section 2000a or 2000a-1 of this title, or (b) intimidate, threaten, or coerce,
           or attempt to intimidate, threaten, or coerce any person with the purpose of
11         interfering with any right or privilege secured by section 2000a or 2000a-1
           of this title, or (c) punish or attempt to punish any person for exercising or
12         attempting to exercise any right or privilege secured by section 2000a or
           2000a-1 of this title.
13

14  *Id.* § 2000a-2.  The gravamen of Mr. Jefferson's Title II claim is that he was treated poorly

15  at the FTC, a place of public accommodation, and ultimately denied the right to use the FTC

16  because of his race.  In a suit under Title II, a plaintiff cannot recover damages and may only

17  seek injunctive relief.  *Newman v. Piggie Park Enters, Inc.,* 390 U.S. 400, 401 (1968); *see*

18  *also* 42 U.S.C. § 2000a-3.[8]

19  A.    Disparate Impact and Discriminatory Intent

20          Under Section 1981, as well as the derivative Section 1983 cause of action, Mr. Jefferson

21  must show that any purported racial discrimination was intentional.  *See Gen. Bldg. Contractors*

22

23          [8] In order to demonstrate standing to seek injunctive relief, Mr. Jefferson must show that he
24  is "likely to suffer future injury" regarding the challenged conduct.  *See City of Los Angeles v.
    Lyons,* 461 U.S. 95, 105 (1983).  Mr. Gonce retired from the FTC in November of 2012, *i.e.,* since
    Mr. Jefferson filed the TAC, the operative and superseding pleading, in May of 2013.  Gonce Decl.
25  ¶ 1.  Here, since Mr. Gonce is no longer at the FTC, Mr. Jefferson lacks standing to bring claims for
    injunctive relief as to Mr. Gonce's discriminatory treatment of him.  *See Krain v. Kahn,* 983 F.2d
26  1076 (9th Cir. 1992) (finding plaintiff could not state a claim under Title II where past conduct
    "appears incredibly unlikely to occur again," rendering an injunction inappropriate); *see also B.C. v.*
27  *Plumas Unified Sch. Dist.,* 192 F.3d 1260, 1264 (9th Cir. 1999) (holding there was no standing for
    injunctive relief regarding school search where plaintiff was no longer a student and had no plans to
28  return to school).  Alternatively, any claim for injunctive relief against Mr. Gonce is moot.

United States District Court

For the Northern District of California

1    *Ass'n, Inc. v. Pennsylvania,* 458 U.S. 375, 391 (1982) (holding "§ 1981, like the Equal Protection

2    Clause, can be violated only by purposeful discrimination"); *Gant v. Wallingford Bd. of Educ.,* 69

3    F.3d 669, 673 (2d Cir. 1995) ("In order to survive a motion to dismiss under any of the civil rights

4    statutes invoked [Section 1981 and Section 1983], the plaintiff must specifically allege the events

5    claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible

6    inference of racially discriminatory intent.").  In sum, a "plaintiff suing under section 1981 must

7    establish intentional discrimination; disparate impact is insufficient."  *Garza v. City of Inglewood,*

8    874 F.2d 816 (9th Cir. 1989).[9]

9        As to Mr. Jefferson's Title II claims asserting racial discrimination, the Supreme Court and

10   the Ninth Circuit have not decided whether disparate impact theories  in Title II cases.  In light of

11   this uncertainty, a number of courts have declined to decide whether such a theory is available under

12   Title II.  *See Arguello v. Conoco, Inc.,* 207 F.3d 803, 813 (5th Cir. 2000) (summarizing cases);

13   *McCoy v. Homestead Studio Suites Hotels,* 390 F. Supp. 2d 577, 585 (S.D. Tex. 2005) aff'd, 177 F.

14   App'x 442 (5th Cir. 2006); *Robinson v. Paragon Foods, Inc.,* No. CIVA1:04CV2940JEC, 2006 WL

15   2661110, at *6 (N.D. Ga. Sept. 15, 2006); *O'Neill v. Gourmet Sys. of Minnesota, Inc.,* 213 F. Supp.

16   2d 1012, 1022 (W.D. Wis. 2002).

17       Some cases that have adopted a disparate impact theory as to Title II.  *Olzman v. Lake Hills

18   Swim Club, Inc.,* 495 F.2d 1333, 1341 (2d Cir. 1974) (discussing *Griggs v. Duke Power Co.,* 401

19   U.S. 424 (1972)); *Robinson v. Power Pizza, Inc.,* 993 F. Supp. 1462, 1465 (M.D. Fla. 1998)

20   ("Plaintiffs need not demonstrate discriminatory intent under a disparate impact theory.").  That

21   said, both of those cases also involved evidence of discriminatory intent motivating otherwise race-

22   neutral rules.  *See Power Pizza,* 993 F. Supp. at 1465 (discussing how, without credible justification,

23   pizza company delivered to predominantly Caucasian community, but not the geographically closer

24   _____

25       [9] The Supreme Court determined that disparate impact alone is insufficient to state a claim
     under Section 1981 by analyzing the close connection between the Civil Rights Act and the
26   Fourteenth Amendment.  *Gen. Bldg.,* 458 U.S. at 391.  In equal protection clause jurisprudence,
     while disparate impact alone is typically not enough, in exceptional cases, "gross statistical
27   disparities" in the impact of a law or ordinance may be so extreme that courts invalidate the
     challenged action based on discriminatory impact alone.  *See The Comm. Concerning Cmty.
28   Improvement v. City of Modesto,* 583 F.3d 690, 703 (9th Cir. 2009).

**United States District Court**

For the Northern District of California

1  community where all but four of the community members were African American); *Olzman v. Lake*

2  *Hills Swim Club, Inc.,* 495 F.2d 1333, 1341 (2d Cir. 1974) (discussing affidavits showing "that

3  members were heard trying to figure out how to define guest so as to preclude blacks; that the

4  present president of the club and former executive board member said, 'If the majority do not want

5  blacks -- than the minority should accept that'"; among even more repugnant allegations).  *Olzman*

6  remanded the case, noting "[a] principal question for resolution is thus whether the supposedly

7  neutral rule was nothing more in reality than a smokescreen to cover the actual intent and effect or

8  whether it was factually grounded in non-racial motivations and operative non-discriminatorily."  *Id.*

9  at 1342.  *Power Pizza* issued a preliminary injunction.  *Power Pizza,* 993 F. Supp. at 1466.

10         Other courts have rejected a disparate impact theory under Title II.  *Akiyama v. U.S. Judo*

11  *Inc.,* 181 F. Supp. 2d 1179, 1187 (W.D. Wash. 2002) (adjudicating case alleging religious

12  discrimination and holding, "there is no claim under Title II where a proprietor or event organizer

13  has set up facially neutral regulations governing the provision of its services, with no indication of

14  discriminatory motive or intent"); *LaRoche v. Denny's, Inc.,* 62 F. Supp. 2d 1366, 1375 n.2 (S.D.

15  Fla. 1999) ("[T]he clear language of Title II itself speaks in terms of disparate treatment (as opposed

16  to disparate impact, for which intent is not an element).").  However, *LaRoche* relies on the lower

17  court decision in *Arguello,* and the Fifth Circuit declined to endorse the lower court's holding as to

18  disparate impact on appeal in *Arguello.*  207 F.3d at 813.  Moreover, at least some commentators

19  have argued that the text of Title II does not limit  its application to intentional discrimination.  *See*

20  Note, *A Public Accommodations Challenge to the Use of Indian Team Names and Mascots in*

21  *Professional Sports,* 112 Harv. L. Rev. 904, 912 (1999) (arguing that the phrasing of Title II – "All

22  persons shall be entitled to the full and equal enjoyment ... of any place of public accommodation"

23  focuses "on the individual's enjoyment of a place of public accommodation, not on the actions or

24  mindset of the offending actor").

25         This Court need not reach the question of whether disparate impact may be alleged under

26  Title II.  Assuming, without deciding, that Mr. Jefferson is able to bring a claim of disparate impact

27  under Title II, as discussed below, he has not established that the residency requirements had a

28  discriminatory impact on a protected class.  For example, Mr. Jefferson alleges only discriminatory

United States District Court

For the Northern District of California

1  motivation in his opposition – more specifically that Mr. Gonce was motivated by an intent to

2  exclude Mr. Jefferson – and presents no evidence or argument as to any purported racial disparate

3  impact. Opp. at 8-9.  Indeed, as noted below, the record evidence suggests the residency requirement

4  did *not* have a disparate impact.

5        Nor has Mr. Jefferson presented evidence to create a disputed issue of material fact as to

6  intentional discrimination.

7        1.    Direct Evidence of Discrimination

8        In this case, the Rule 26 witnesses that Mr. Jefferson disclosed on liability, largely players

9  who had been teammates of Mr. Jefferson, fail to offer any testimony or evidence that supports a

10 finding of racial animus.  The dearth of testimony suggests that a reasonable jury cannot agree with

11 Mr. Jefferson's unsubstantiated allegation that he "and his team were prohibited from using the same

12 equipment that FTC offered to the non-minority teams," *see* TAC ¶ 13, that Defendants "harass[ed]

13 Plaintiff and his team," *see id.* ¶ 13, that Mr. Jefferson and his multi-cultural team were not welcome

14 at the FTC, *see id.* ¶ 15, or that the FTC's residency policy "rid the facility of minorities," *see id.* ¶

15 21.  Mr. Rubin, Mr. Jefferson's only witness to suggest some differential treatment, specifically

16 declined to characterize the most troubling alleged statement by Mr. Gonce to Mr. Rubin as racially

17 derogatory.  Rubin Tr. at 23-25.  Instead, from his experience, Mr. Rubin could not draw the

18 inference that Mr. Gonce discriminated against others on the basis of race.  *Id.* at 51:13-54:4.

19 Another one of Mr. Jefferson's teammates and Rule 26 liability witnesses testified:

20        Obviously, there's – obviously, there's a lot of people that play at the
         tennis center that come from different backgrounds; African-Americans,
21        Filipinos, Chinese, Indians.  We also have Latinos that come out and play
         there, but again, there's no sort of, you know, special kind of treatment
22        for certain groups of people or, you know, anything that may be related
         to racism.  I never witnessed any of that.
23

24 Concepcion Tr. 41:4-11.  Mr. Concepcion went on to testify specifically that Mr. Gonce never

25 discriminated against him or harassed him.  *Id.* at 41:12-16.

26        As to the residency requirement for USTA league play, the evidence reveals no disparate

27 impact stemming from the residency requirements.  Gregory Blatnik – one of Mr. Jefferson's Rule

28 26 witnesses, a Fremont resident, and a USTA team captain – testified that he was affected by the

aspect of the residency rules that favors teams with more Fremont residents.  Blatnik Tr. at 24:22-25:14.  Mr. Blatnik is Caucasian.  *See* Singla Tr. at 39:5-6.  The Defendants have introduced documents that identify two non-Fremont resident captains who were, like Mr. Jefferson, affected by the residency requirement rule regarding team captains.  *See* Gonce Decl., Ex. O.  The two non-Fremont resident captains who were excluded by the rule revision are both Caucasian.  Gonce Decl. ¶ 32.  Mr. Jefferson has pointed to no other minority team captain who was affected by the residency requirement.  On this record, three of the four tennis captains impacted by the new residency rules were Caucasian.  Mr. Jefferson has failed to establish any disparate impact, thus undermining any disparate impact theory and negating any claim of intentional discrimination which is predicated on disparate impact.

<div style="padding-left:2em">

2.    *McDonnell Douglas* Burden Shifting

</div>

The Ninth Circuit has approved the use of *McDonnell Douglas* burden-shifting in Section 1981 cases as a method for proving disparate treatment motivated by race.  *Lindsey v. SLT Los Angeles, LLC,* 447 F.3d 1138, 1144 (9th Cir. 2006).  Thus, Mr. Jefferson could attempt to prove intentional discrimination by showing that Mr. Jefferson:  (1) is a member of a protected class; (2) attempted to contract for services and afford himself the full benefits and enjoyment of a public accommodation; (3) was denied the full benefits or enjoyment of a public accommodation, and that (4) such services were available to similarly situated persons outside his protected class who received full benefits.  *See Slocumb v. Waffle House, Inc.,* 365 F. Supp. 2d 1332, 1342 (N.D. Ga. 2005); *see also McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).  Some courts have suggested that in non-employment Section 1981 cases, courts should follow the lead of the Sixth Circuit and relax the rubric as to the fourth element, allowing plaintiffs to allege *either* the fourth element as to similarly situated persons *or* that "plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory."  *Lindsey,* 447 F.3d at 1144.  In any event, if Mr. Jefferson makes a *prima facie* case, the burden would shift to Defendants to show a legitimate reason for its actions.  *Id.; McDonnell Douglas,* 411 U.S. at 802.

Setting aside the residency requirements, it appears that the only incident in which Mr. Jefferson was not allowed to get on a court to begin play was in June 2011.  In that instance, the

United States District Court
For the Northern District of California

1   evidence shows that Mr. Jefferson did not make a timely request for reservation.  *Cf. Lindsey,* 447

2   F.3d at 1147 (noting "evidence of the submission of payment seventy-two hours in advance further

3   supports Panache's argument that it had fulfilled its contractual obligations.").  Moreover, other than

4   referring generally to Mr. Rubin's testimony, Mr. Jefferson has not offered any evidence supporting

5   the fourth element of a *prima facie* case:  either that similarly-situated persons outside of the

6   protected class were treated better or that plaintiff received services in a markedly hostile manner

7   that is objectively discriminatory.  As discussed, *supra,* Mr. Rubin's testimony does not carry this

8   burden.

9           Even assuming *arguendo* that Mr. Jefferson had shown a *prima facie* case of disparate

10   treatment in his use of the courts, Defendants have rebutted it with evidence of the City of Fremont's

11   legitimate purposes for its actions, such as enforcing FTC rules applicable to all.  As to the residency

12   requirement for USTA league play, Defendants have established without contradiction legitimate

13   reasons for the residency criteria.  For example, Defendants have shown the need for added criteria

14   because of demand for court time and have pointed to other regional tennis centers that also use

15   residency policies to give priority to USTA league teams.  Gonce Decl. ¶¶ 20-31.

16           This showing shifts the burden back to Mr. Jefferson to show pretext.  *See Schechner v.*

17   *KPIX-TV,* 686 F.3d 1018, 1025 (9th Cir. 2012).  Yet, Mr. Jefferson has offered no evidence of

18   pretext.

19   B.      <u>Municipal Liability</u>

20           The City of Fremont argues that irrespective of any proof of discrimination by Mr. Gonce, it

21   is entitled to summary judgment as to all three causes of action, because *respondeat superior*

22   liability does not apply to municipalities.  The City of Fremont further argues that there was no

23   official policy or custom sufficient to establish causation under Section 1983.

24           Municipal liability is critical, because it is appropriate to treat this suit, nominally against the

25   City of Fremont, its municipal department (the FTC), and its employee, as a case against the City of

26   Fremont alone.  As the Supreme Court commented in *Monell v. Department of Social Services,*

27   "official-capacity suits generally represent only another way of pleading an action against an entity

28   of which an officer is an agent."  436 U.S. 658, 690 n.55 (1978).  Thus "[a]s long as the government

United States District Court

For the Northern District of California

entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham,* 473 U.S. 159, 165 (1985).  In this case, Mr. Jefferson is suing Mr. Gonce "in his official capacity."  TAC ¶ 7.  As a result, the claims against Mr. Gonce are duplicative of Mr. Jefferson's claims against the City of Fremont.  For all practical purposes, this action is a suit against the City of Fremont.  *See Brandon v. Holt,* 469 U.S. 464, 472 (1985) ("The suit was nominally against the city's Department of Social Services, but that Department had no greater separate identity from the city than did the Director of the Department when he was acting in his official capacity.");[10] *see also Vance v. County of Santa Clara,* 928 F. Supp. 993, 996 (N.D. Cal. 1996) ("The Court follows other District Courts in holding that if individuals are being sued in their official capacity as municipal officials and the municipal entity itself is also being sued, then the claims against the individuals are duplicative and should be dismissed.").

In *Monell,* the Supreme Court held that there is no municipal *respondeat superior* liability under Section 1983.  436 U.S. at 691.  In other words, "a municipality cannot be held liable solely because it employs a tortfeasor."  *Id.*  Instead, showing municipal liability requires that "an action pursuant to official municipal policy of some nature caused a constitutional tort."  *Id.*  Thus, "only when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" will the municipal entity be held liable under Section 1983.  *Id.* at 694.  The *Monell* rule against *respondeat superior* liability applies even where plaintiff seeks prospective relief.  *See Los Angeles Cnty., Cal. v. Humphries,* 131 S. Ct. 447, 451 (2010).

The Ninth Circuit has specifically extended the reasoning of *Monell* to hold that there is likewise no *respondeat superior* liability under Section 1981.  *See Federation of African Am.Contractors v. City of Oakland,* 96 F.3d 1204, 1215 (9th Cir. 1996).  Other courts have found

---

[10] In their Motion, Defendants seek qualified immunity as to Mr. Gonce.  Qualified immunity does not apply, because Mr. Gonce is being sued in his official capacity.  "The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment."  *Kentucky,* 473 U.S. at 167.  *See Owen v. City of Independence,* 445 U.S. 622, 638 (1980).

**United States District Court**

For the Northern District of California

1  that *Monell* applies to Title II claims as well.  *See, e.g.*, *Jones v. Boston*, 738 F. Supp. 604, 606 (D.

2  Mass. 1990) (reasoning that, because "*respondeat superior* does not apply to section 1983 claims," it

3  should also not apply to section 2000a claims).

4        1.    <u>Two Theories of Liability</u>

5        Mr. Jefferson's case rests on two theories of liability.  First, he alleges (under his Title II

6  claim) that Mr. Gonce engaged in intentional acts of discrimination in the form of disparate

7  treatment.  *Id.* ¶ 20-21.  Second, Mr. Jefferson argues that the residency rules only appear race

8  neutral, but was in fact discriminatory.  TAC ¶ 20.  This, he alleges, prohibited him from contracting

9  with the FTC, while similarly situated persons outside of the protected class were not prohibited.  *Id.*

10  ¶¶ 24-26.

11        2.    <u>Three Bases for *Monell* Liability</u>

12        In *Gillette v. Delmore* the Ninth Circuit set out three ways for a plaintiff to establish

13  municipal liability:  First, "the plaintiff may prove that a city employee committed the alleged

14  constitutional violation pursuant to a formal governmental policy or a longstanding practice or

15  custom which constitutes the standard operating procedure of the local governmental entity."  979

16  F.2d 1342, 1346-47 (9th Cir. 1992).  Second, "the plaintiff may establish that the individual who

17  committed the constitutional tort was an official with 'final policy-making authority' and that the

18  challenged action itself thus constituted an act of official governmental policy."  *Id.*  When there is

19  such "final policy-making" authority, a "single decision" by a municipal policymaker may be

20  enough for *Monell* liability under certain circumstances.  *Id.* (citing *Pembaur v. City of Cincinnati*,

21  475 U.S. 469, 480 (1986)).  Finally, "the plaintiff may prove that an official with final policy-

22  making authority ratified a subordinate's unconstitutional decision or action and the basis for it."  *Id.*

23  at 1347.

24        Even if, contrary to the conclusions above, the evidence were sufficient to show that Mr.

25  Gonce engaged in purposeful discriminatory conduct, *Monell* liability does not apply through any of

26  the three possible prongs.

27

28

a.   <u>Policy Or Custom</u>

Mr. Jefferson has failed to show a "policy or custom" giving rise to municipal liability.  The City of Fremont cannot be subject to municipal liability absent proof of "the existence of an unconstitutional municipal policy." *Praprotnik,* 485 U.S. at 128.  Identifying a policy matters, because doing so "ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown,* 520 U.S. 397, 403-04 (1997).  For that reason, "[o]fficial municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson,* 131 S. Ct. 1350, 1359 (2011).  In addition, the municipal policy itself must cause the alleged deprivation of rights.  *See Monell*, 436 U.S. at 690*; see also Coming Up, Inc. v. City & Cnty. of San Francisco,* 830 F. Supp. 1302, 1311-12 (N.D. Cal. 1993).

i.   <u>Disparate Treatment by Mr. Gonce</u>

In opposition, Mr. Jefferson argues that Mr. Gonce's discriminatory actions gave rise to an unconstitutional custom.  *See* Opp. at 15.  Under *Monell,* even where there is no formal policy or law, "persistent and widespread discriminatory practices of state officials . . . could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law."  *See Monell,* 436 U.S. at 691 (citation omitted).  On the record before the Court, however, Mr. Jefferson has not shown evidence of an unconstitutional custom.  For example, he has not shown a pattern of repeated discrimination with respect to other minority players.  *See Gillette,* 979 F.2d at 1349.  The deficiency of the record is highlighted by the lack of supporting testimony from the team members that Mr. Jefferson listed as Rule 26 liability witnesses.

Furthermore, Mr. Jefferson has been inconsistent throughout the litigation with respect to the time frame and scope of the alleged discriminatory practices.  For example, his complaint states that there were no incidents "from 1985 through 2009."  TAC ¶ 12.  At his deposition he testified that Mr. Gonce did not interfere with Mr. Jefferson's ability to reserve courts for recreational play and did not handle scheduling USTA tournaments.  Jefferson Tr. at 124:7-21; 116:7-14.  Mr. Jefferson

United States District Court
For the Northern District of California

1  now alleges that discrimination started at some point in 2000, *see* Opp. at 3, and claims, without

2  citing evidence in the record, that there were problems relating to recreational play. *See* Opp. at 11.

3  Such ambiguity (or, in a less charitable light, inconsistency) as to time frame negates any showing of

4  a persistent, widespread, or well-settled custom. *See Gillette,* 979 F.2d at 1349 (observing that

5  duration of the alleged custom "is a crucial element of the inquiry" and concluding that no

6  reasonable jury could have found that termination was pursuant to an informal policy).

ii.    Residency Requirements

8          Mr. Jefferson must show that his alleged "deprivation resulted from an official policy or

9  custom established by a municipal policymaker possessed with final authority to establish that

10  policy." *Erdman v. Cochise Cnty., Ariz.,* 926 F.2d 877, 882 (9th Cir. 1991); *see also Waggy v.*

11  *Spokane Cnty. Washington,* 594 F.3d 707, 713 (9th Cir. 2010). The policy or custom requirement is,

12  among other things, "intended to prevent the imposition of municipal liability under circumstances

13  where no wrong could be ascribed to municipal decisionmakers." *City of Oklahoma City v. Tuttle,*

14  471 U.S. 808, 821 (1985). Furthermore, Mr. Jefferson must show, at a minimum, "an affirmative

15  link between the policy and the particular constitutional violation alleged." *Id.* at 823. In cases

16  "where the policy relied upon is not itself unconstitutional, considerably more proof than [a] single

17  incident will be necessary in every case to establish both the requisite fault on the part of the

18  municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Id.*

19  at 824.

20          In the case at bar, the residency requirements have at least one core characteristic of a policy.

21  "[T]he word 'policy' generally implies a course of action consciously chosen from among various

22  alternatives." *Tuttle,* 471 U.S. at 823. Here, it is undisputed that Mr. Gonce considered "various

23  ways" of limiting the number of USTA teams seeking to play at the FTC in revising the USTA

24  guidelines. Gonce Decl. ¶ 26. In other words, the residency requirements were consciously chosen

25  from various alternatives. *Id.* at ¶ 27.

26          On the other hand, there is no evidence that the alleged "policy" or "custom" was established

27  by the municipal decisionmakers of the City of Fremont. Mr. Jefferson does not dispute that the

28  USTA guidelines were never approved by the City Manager or City Council. King Decl. ¶ 24. Mr.

20

1   Jefferson also does not dispute that the revised guidelines with the residency requirements were

2   approved by Mr. King and not Mr. Gonce.  *Id.*  The custom be of the type "of which the supervisor

3   must have been aware."  *Gillette,* 979 F.2d at 1348 (quoting *Praprotnik,* 485 U.S. at 130).  As

4   explained in *Praprotnik:*  "It would also be a different matter if a series of decisions by a

5   subordinate official manifested a 'custom or usage' of which the supervisor must have been aware.

6   In [that case], the supervisor could realistically be deemed to have adopted a policy that happened to

7   have been formulated or initiated by a lower-ranking official."  *Praprotnik,* 485 U.S. at 130.

8          Even if the residency requirement was deemed a policy or custom, as discussed above, Mr.

9   Jefferson offers only conjecture, without evidence, that the revised guidelines had a racially

10  discriminatory motivation or disparate impact.  Mr. Jefferson has not produced any evidence of a

11  causal connection between that policy and any unconstitutional violation.  *See Tuttle,* 471 U.S. at

12  844.

13                      b.      Actions by A Final Policymaker

14         Under the second possible basis for municipal liability, a single act or decision by a final

15  policymaker can lead to *Monell* liability, because "where action is directed by those who establish

16  governmental policy, the municipality is equally responsible whether that action is to be taken only

17  once or to be taken repeatedly."  *Pembaur,* 475 U.S. at 481.  The *Pembaur* court, however,

18  "hasten[ed] to emphasize that not every decision by municipal officers automatically subjects the

19  municipality to . . . liability."  *Id.*  Such liability "attaches only where the decisionmaker possesses

20  final authority to establish municipal policy with respect to the action ordered."  That is, the

21  authority to make municipal policy must be "the authority to make final policy."  *Praprotnik,* 485

22  U.S. at 127.  Determining who has authority to make final policy is a legal question governed by

23  state law.  *See Gillette,* 979 F.2d at 1346-47.  Relevant to the inquiry are "statutes, ordinances,

24  regulations, city charters, and other similar enactments."  *Coming Up,* 830 F. Supp. at 1308.

25         On this record, Mr. Gonce, the only individual identified as having engaged in improper

26  conduct, was neither the final policymaker nor delegated final policymaking authority.  Even

27  assuming that Mr. Gonce engaged in discriminatory conduct, as a part-time Tennis Operations

28  Supervisor, Mr. Gonce lacked authority to make final policy for the City of Fremont.  The City of

United States District Court

For the Northern District of California

1    Fremont's general ordinances treat Fremont's city council as responsible for general policies

2    regarding community recreation.  *See* Fremont, Cal., Fremont Municipal Code, Ordinance 23-2014,

3    ch. 2.20, art.6, §§ 2.20.160-2.20.210.  Fremont's general ordinances also task a seven-member

4    recreation commission with providing the city council recommendations and guidance for

5    determination of general policies.  *Id.*  Nowhere do the ordinances confer any policymaking

6    authority or suggest delegated authority to the Tennis Operations Supervisor.

7          Moreover, Mr. Jefferson does not contest Mr. King's declaration that Mr. Gonce lacked final

8    policymaking authority.  *See* King Decl. ¶¶ 4; 24.  Nor does Mr. Jefferson dispute that Mr. King

9    would have to have reviewed and approved any policy recommendations of Mr. Gonce.  *Id*.  Mr.

10   King's approval authority precludes *Monell* liability based solely on Gonce's actions, because "when

11   an official's discretionary decisions are constrained by policies not of that official's making, those

12   policies, rather than the subordinate's departures from them, are the act of the municipality."

13   *Praprotnik*, 485 U.S. at 127.

14                      i.      Disparate Treatment by Mr. Gonce

15         To the extent that Mr. Gonce exercised improper discretion in carrying out his

16   responsibilities as to "scheduling use of the FTC by all types of tennis player . . . [and] operating the

17   FTC within its budget," King Decl. ¶ 4, such discretion does not suffice for *Monell* liability without

18   final policymaking authority.  *See Praprotnik,* 485 U.S. at 126 ("If the mere exercise of discretion

19   by an employee could give rise to a constitutional violation, the result would be indistinguishable

20   from *respondeat superior* liability.").  Nor does the exercise of such discretion necessarily evidence

21   delegation of final policymaking authority.  *See Coming Up,* 830 F. Supp. at 1313 (finding police

22   chief was not policymaker where the police chief "has discretion in the exercise of particular

23   functions[,] [] manages daily police operations[,] [and] can recommend policy, follow policy,

24   execute policy, but he cannot establish policy with respect to the policy at issue in this case"); *see*

25   *also Schiff v. City & Cnty. of San Francisco,* 816 F. Supp. 2d 798, 813 (N.D. Cal. 2011), *aff'd,* 528

26   F. App'x 743 (9th Cir. 2013) ("[T]he final policymaker for personnel matters. . . is free to delegate

27   broad operational authority . . . without turning [the delegate] into a "final policymaker.").  Mr.

28

1    Jefferson has failed to show that the alleged tortfeasor, Mr. Gonce, had final policymaking authority

2    that would subject the City of Fremont to liability for his actions.[11]

3         Moreover, for municipal liability to attach, the plaintiff must establish that the final

4    policymaker engaged in culpable conduct that caused plaintiff's injury; in particular, "a plaintiff

5    seeking to establish municipal liability on the theory that a facially lawful municipal action has led

6    an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with

7    'deliberate indifference' as to its known or obvious consequences." *Bd. of Cnty. Comm'rs of Bryan*

8    *Cnty., Okl. v. Brown,* 520 U.S. 397, 407 (1997).  "'[D]eliberate indifference' is a stringent standard

9    of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his

10   action." *Id.* at 410.  The lay definition of indifference, which may be inferred from mere

11   inadequacy, is not enough for deliberate indifference.  *Id.* at 411.  Even if Mr. Gonce engaged in

12   discriminatory conduct against Mr. Jefferson, there is no evidence that the City of Fremont's final

13   policymaker (such as Mr. King or more likely someone above Mr. King's level) had any knowledge

14   of such discriminatory animus.  Nor is there any evidence that such decision makers had reason to

15   believe that subordinates were engaging in unconstitutional conduct.  "A supervisor is only liable for

16   constitutional violations of his subordinates if the supervisor participated in or directed the

17   violations, or knew of the violations and failed to act to prevent them." *Taylor v. List,* 880 F.2d

18   1040, 1045 (9th Cir. 1989); *see also Brown,* 520 U.S. at 414 (finding that "[sheriff's] inadequate

19   scrutiny of [deputy's] record cannot constitute 'deliberate indifference' to respondent's federally

20   protected right to be free from a use of excessive force," because while inadequate scrutiny may

21   raise the likelihood of a violation of rights, it does not compel the inference that failure to scrutinize

22   produced a specific constitutional violation).

23

24

25   _____

26       [11] Nor is there evidence in the record that Mr. Gonce's supervisor, Kelly King, would have
     had sufficient authority to be considered the final policymaker for the City of Fremont.  Mr.
27   Jefferson's only allegation as to Mr. King (and Mr. King's supervisor, Parks and Recreation
     Director, Annabell Holland) pertains to Mr. King's and Ms. Holland's perceived failure to
28   "intervene and prevent the damages ultimately caused to Mr. Jefferson [by] their employee Mr.
     Gonce." Opp. at 17.  Mr. Jefferson does not support this charge with any evidence.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

ii.      Residency Requirements

Mr. Jefferson has not shown that any final policy maker of the City of Fremont had any knowledge that adoption of the race neutral residency requirements for USTA league play had a racially disparate impact or was motivated by race.

c.      Ratification

The record does not reflect ratification.  "*Praprotnik* requires that a policymaker approve a subordinate's decision *and the basis for it* before the policymaker will be deemed to have ratified the subordinate's discretionary decision."  *Gillette,* 979 F.2d at 1347-48 (emphasis in original).  As noted above, Mr. Jefferson presents no evidence that Mr. King or any higher city official with final policy-making authority ratified the basis, *i.e.,* the alleged racial animus, for the purportedly unconstitutional conduct by Mr. Gonce.

i.      Disparate Treatment by Mr. Gonce

On the eve of argument, Mr. Jefferson filed a letter he wrote to the Fremont City Attorney's Office in 2011.  Docket No. 111.  Mr. Jefferson argued at the hearing that the letter evidenced that municipal officials more senior than Mr. Gonce were aware of his concerns.  The record also reflects that Mr. Jefferson had meetings with Mr. Gonce's superiors, including Mr. King, after Mr. Jefferson complained regarding Mr. Gonce.  Nevertheless, Mr. Jefferson's attempts to reach the "personal conduct" of those who "refused to overrule" Mr. Gonce "must be rejected, because it would always permit an 'end run' around [*Monell*]."  *Weisbuch v. Cnty. of Los Angeles,* 119 F.3d 778, 781-82 (9th Cir. 1997).  Even assuming that Mr. Jefferson made an adequate showing that Mr. Gonce's superiors became aware of the conflict and showed "favoritism toward the perspective of Mr. Gonce," Opp. at 7, finding municipal liability on those grounds "would simply smuggle *respondeat superior* liability into section 1983 law under the guise of *Pembaur's* 'single decision' rule," where there is no evidence that any final policy maker had knowledge that Mr. Gonce's conduct was *motivated by race*.  *Id.*  Instead, the record reflects that investigations of Mr. Gonce's superiors based on communications with various staffers and Mr. Jefferson, concluded that the conflicts stemmed from Mr. Jefferson's "verbal abuse" of staffers, repeated failures to pay his fees in a timely manner, and other rule violations.  *See* King Decl. ¶¶ 12, 14, 17, 21; Exs. C, D.

United States District Court

For the Northern District of California

ii.    Residency Requirements

The only alleged constitutional violation as to the residency requirements relates to their purported disparate impact and discriminatory motivation.  As discussed, *supra,* the record does not support a finding of disparate impact.  More importantly, there is no evidence that any final policymaker knew of or ratified any alleged disparate impact or discriminatory motive behind the residency requirements.  Instead, the record reflects that the residency requirements were developed at the request of Kelly King, in response to increased USTA league team demand, in consultation with the USTA, and after consideration of similar residency requirements adopted by other regional tennis centers.  Gonce Decl. ¶¶ 20-31.  Mr. Jefferson does not dispute any of these facts.  *See* Opp. at 8.

Finally, the Court previously held that the Second Amended Complaint failed to plead ratification or deliberate indifference.  *See* Docket No. 63 at 6-7.  In Mr. Jefferson's Second Amended Complaint, in arguing that he had made a proper demand for state law purposes, Mr. Jefferson referenced a March 2011 email, a letter in 2011, and face-to-face meetings in connection with the FTC's investigation of his claims, including a meeting with the city attorney.  *See* Docket No. 53 ¶ 15.  The Court, in assessing municipal liability, found that the only theory of liability that appeared viable was the theory that Mr. Gonce had final policy-making authority.  *See* Docket No. 63 at 6-7.  The TAC does not add allegations that revive an argument regarding ratification or deliberate indifference.  Nor does the record reflect any facts that would allow a reasonable jury to conclude that ratification had been proven.  *Cf. Christie,* 176 F.3d at 1239 (determining that plaintiff survived summary judgment as to ratification by showing evidence of policymaker's specific involvement in challenged conduct).

### IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Defendants' motion for summary judgment.  Summary judgment is proper, because Mr. Jefferson has failed to present sufficient evidence on which a jury could reasonably find race-based discrimination against him;  nor is there any basis in the record for municipal liability under *Monell*.  Mr. Jefferson's Title II, Section 1981, and Section 1983 claims are dismissed.

1     This order disposes of Docket No. 96.  The clerk shall enter Judgment for Defendants and

2  close the case file.

3

4     IT IS SO ORDERED.

5

6  Dated:  November 6, 2014

7                                                    _____

8                                                    EDWARD M. CHEN
                                                     United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28